Hilda Garza **WIELAND, Plaintiff,**

v.

**DEPARTMENT OF TRANSPORTATION, STATE OF INDIANA (By and Through), Defendants.**

**No. 3:98CV0648 AS.**

United States District Court,
N.D. Indiana,
South Bend Division.

May 19, 2000.

---

it would appear in the written record is in the appeal form." *Mayers v. Anderson,* 93

F.Supp.2d at 966 n. 3.

Richard Carl DeLaney, Michael Hartburg, Gordon Bendall Branham McNeely and DeLaney, Huntington, IN, for Hilda Garza Wieland, plaintiff.

Theresa A. Stevens, Indiana Attorney General, Indiana Government Center South, Indianapolis, IN, for Department of Transportation, State of Indiana, defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

This cause is before the Court on Defendants' Motion for Summary Judgment. The parties have fully briefed the issues and the Court heard oral argument on March 6, 2000. The issue is now ripe for ruling.

## JURISDICTION

The case is brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.* and § 1981. Jurisdiction is proper pursuant to 28 U.S.C. § 1331.

## BACKGROUND

The complaint in this case was filed by counsel on behalf of Hilda Garza Wieland (Garza)[1], an Hispanic female, on or about December 18, 1998. The defendants are in truth the State of Indiana because this plaintiff was employed by the Indiana Department of Transportation (INDOT). Garza began working for INDOT on November 29, 1994, in the Fort Wayne division, as a "Highway Maintenance Worker 3 (HWM3) at the North Manchester Unit thereof." Garza is a member of a workforce that has a collective bargaining agreement (CBA) and that agreement was in effect throughout the relevant time period.

Part of this dispute arose when co-employee, Glenda Ervin, who originally held the "working leader" (WL) position for Garza's unit, resigned that position. The WL position was not a management job, but was a step above the HMW3 worker with slightly higher pay and was classified as HMW3 (WL).[2] On September 11, 1996,

---

1. Plaintiff has divorced since filing this suit and now uses her former name, Garza.

2. WL's had no authority to hire, fire or discipline employees. The WL was essentially a "crew leader." Management would give the

Ervin requested a voluntary demotion and returned to an HMW3 classification.[3] Garza expressed an interest in Ervin's former position. A male employee, Jeff Brubaker likewise expressed an interest in that job. Del Auer, the subdistrict manager, recommended yet another person for the working leader position, namely, Phil Hill because of his long service and highly competent work.[4] The position was not posted as such, no-one made a formal application and there were no interviews because it is asserted none were required under the union's CBA. Hill was transferred to the position on July 13, 1997. Garza complained openly about Hill's appointment to the WL position. She alleges that management failed to offer her the position because she was female. INDOT asserts that the job was awarded based on seniority as required by the CBA, and claims that if Hill had not accepted the job, Brubaker was next in line.[5]

Garza also alleges she was subjected to race, sex and national origin harassment and a hostile environment. She claims INDOT retaliated against her after she complained of the not being offered the WL position by subjecting her to excessive drug testing and giving her undesirable work assignments. Finally, she argues that conditions became so intolerable that she was constructively discharged. INDOT seeks summary judgment on all claims.

### SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Bragg v. Navistar Int'l Trans. Corp.*, 164 F.3d 373 (7th Cir. 1998); *Leisen v. City of Shelbyville*, 968 F.Supp. 409 (S.D.Ind.1997), *aff'd* 153 F.3d 805 (7th Cir.1998).

The initial burden is on the moving party to demonstrate, "with or without supporting affidavits," the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56); *Larimer v. Dayton Hudson Corp.*, 137 F.3d 497 (7th Cir.1998), *reh'g denied*. A question of material fact is a question which will be outcome determinative of an issue in the case. The Supreme Court has instructed that the facts material in a specific case shall be determined by the substantive law controlling the given case or issue. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate 'specific facts shows that there is a genuine [material] issue for trial.'" *Id.* The non-moving party cannot rest on its pleadings, *Weicherding v. Riegel*, 160 F.3d 1139 (7th Cir.1998); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920–21 (7th Cir.1994), *reh'g denied*, nor may that party rely upon conclusory allegations in affidavits. *Smith v. Shawnee Library Sys.*, 60 F.3d 317, 320 (7th Cir.1995). This general standard is applied with added

WL the daily work assignments and the WL then made sure the jobs got done.

**3.** No reason is actually stated for Ervin's transfer request, but the record indicates it is possible that tension between Ervin and the unit caused her to step down. There is testimony that she did not get along with people and was not respected as a working leader.

**4.** Apparently, the supervisor sought out Mr. Hill and all of the supervisors recommended him on the basis of competence and more than 20 years experience.

**5.** Hill was hired by INDOT in 1973, Jeff Brubaker in 1981, and Garza in 1984.

rigor in employment discrimination cases, where intent is inevitably the central issue. *DeLuca v. Winer Indus., Inc.,* 53 F.3d 793 (7th Cir.1995); *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368 (7th Cir.1992); *Tomasello v. Delta Air Lines, Inc.,* 8 F.Supp.2d 1090 (N.D.Ill.1998). Accordingly, "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Collier v. Budd Co.,* 66 F.3d 886, 892 (7th Cir.1995); *Courtney v. Biosound, Inc.,* 42 F.3d 414, 418 (7th Cir.1994).

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the non-movant and all factual disputes resolved in her favor. *Schneiker v. Fortis Insurance Co.,* 200 F.3d 1055 (7th Cir.2000); *Baron v. City of Highland Park,* 195 F.3d 333, 337–38 (7th Cir.1999). The burden of establishing a lack of any genuine issue of material fact rests on the movant. *Wollin v. Gondert,* 192 F.3d 616, 621–22 (7th Cir. 1999); *Essex v. United Parcel Service, Inc.,* 111 F.3d 1304, 1308 (7th Cir.1997). The nonmovant, however, must make a showing sufficient to establish any essential element for which she will bear the burden of proof at trial. *Celotex,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265; *Shank v. William R. Hague, Inc.,* 192 F.3d 675, 681 (7th Cir.1999); *Wintz v. Northrop Corp.,* 110 F.3d 508, 512 (7th Cir.1997). Applying the above standard, this Court addresses Defendant's motion.

### DISCUSSION

Garza's Complaint alleges race, sex and national origin harassment, discriminatory failure to promote, retaliation, and constructive discharge in violation of Title VII and § 1981(a).

### A. Discriminatory Failure to Promote

Garza applied for the working leader position that was voluntarily vacated by Ervin, a female. She claims she was denied the promotion due to her sex. Furthermore, Garza claims that the State of Indiana, through INDOT, has a *de facto* policy of preferring male working leaders over female working leaders. The State of Indiana categorically denies any such policy.

Garza can avert summary judgment for INDOT either by putting in enough evidence of discriminatory motivation to create a triable issue, the "direct method," or by establishing a *prima facie* case under the "burden shifting formula." Civil Rights Act of 1964, § 701 *et seq.,* 42 U.S.C. § 2000e *et seq. See also, Emmel v. Coca–Cola Bottling Co. of Chicago,* 95 F.3d 627, 629 (7th Cir.1996) (direct method); *McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (burden shifting). Here, Garza attempts to make her case under both methods. For summary judgment purposes, however, when the defendant provides a legitimate, non-discriminatory reason for non-promotion the court may avoid deciding whether the plaintiff has met her *prima facie* case and instead decide to dismiss the claim because there is no showing of pretext. *See E.E.O.C. v. Our Lady of the Resurrection Med. Ctr.,* 77 F.3d 145, 149–50 (7th Cir.1996). INDOT has provided a non-discriminatory reason for its failure to promote Garza. Accordingly the Court may move directly to the issue of pretext. *Abioye v. Sundstrand Corp.,* 164 F.3d 364, 368 (7th Cir.1998), *cert. denied* 527 U.S. 1003, 119 S.Ct. 2337, 144 L.Ed.2d 235 (1999).

■ Title VII contains an exception which applies to collective bargaining agreements and seniority. *See* 42 U.S.C. § 2000e–2(h). It provides that:

"it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority ... system, ... provided that such differences are not the result of an

intention to discriminate because of race."

*Id.* Applying this section, courts have determined that absent a discriminatory purpose, the operation of a seniority system cannot be an unlawful employment practice even if the system has some discriminatory consequences. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 353–54, 97 S.Ct. 1843, 1864, 52 L.Ed.2d 396 (1977); *American Tobacco Co. v. Patterson,* 456 U.S. 63, 65, 102 S.Ct. 1534, 1535, 71 L.Ed.2d 748 (1982); *Chambers v. Parco Foods, Inc.,* 935 F.2d 902, (7th Cir.1991); *Wattleton v. Int'l Broth. of Boiler Makers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, Local No.* 1509, 686 F.2d 586 (7th Cir.1982), *cert. denied.* INDOT argues that the terms of the CBA that was in effect prevented it from offering the working leader position to Garza. First, INDOT asserts that the move to the working leader position was a transfer not a promotion, therefore Garza has no failure to promote claim.[6] In transfer situations, the CBA requires INDOT to first select from the transfer unit, then from within the agency, and finally from the entire pool of employees. (CBA Art. 23 § A.2.) The selection is based on seniority. Hill's seniority date was March 26, 1973, Garza's seniority date was November 29, 1994, and Jeff Brubaker's seniority date was July 7, 1981. Obviously, Hill was the most senior of the three HWM3 employees. Furthermore, INDOT asserts that a recent ALJ decision which resulted in the requirement that open working leader positions must be filled on the basis of seniority is binding.[7] Therefore, INDOT claims it was complying with the CBA and the current law when it offered the working leader position to Hill.

■ Garza claims this is a pretext. Basically, to meet her burden here, Garza must present evidence to suggest not that INDOT was mistaken in denying her "promotion" but that it was lying in order to cover up the true reason, her gender. *Jordan v. Summers,* 205 F.3d 337 (7th Cir.2000); *Vanasco v. National–Louis University,* 137 F.3d 962 (7th Cir.1998). *See also, Crim v. Board of Educ. of Cairo School Dist. No. 1,* 147 F.3d 535, 541 (7th Cir.1998). The Court must carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture. This undertaking is not one of guesswork or theorization. "An inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact [that is known to exist]." 1 Leonard B. Sand, et al., Modern Federal Jury Instructions P 6.01, instr. 6–1 (1997). Thus, the question is whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances. In this case, it cannot. Garza has provided no evidence that the CBA does not govern the working leader position, or that INDOT's interpretation of its terms is incorrect.[8] Instead, she argues that this "technical justification" is unimportant. (Plf.'s Response at 23.) Ad-

---

6. The CBA provides that: "Transfer shall be defined as the change of an employee from one position to another in the same classification which also involves a change in shift, schedule, district, unit, division, department, building or ward but not solely a change in supervisor." (CBA Art. 23 § A. 1., Def.'s Ex. F.) Hill was classified as an HMW3 employee. The working leader position was classified as HMW3 (WL).

7. INDOT refers the Court to and points to *In Re: Walter Hunter Grievance,* an arbitrated decision of February 24, 1997. (Def.'s Mem.

in Support at 7, n. 1.) In this case, INDOT believed the working manager position was a promotion and the Union believed is was a transfer. The ALJ determined it was a transfer for the purposes of seniority and the CBA.

8. Garza relies on excerpts from the deposition testimony of two INDOT employees who stated that they "didn't think" seniority was controlling. (*See* Auer Dep. at 22–23; Moore Dep. at 31–35.) She does not provide the bargaining agreement, or testimony from any union officer to support her position.

ditionally, Garza claims that Moore, the highway management supervisor for Garza's unit, told her INDOT probably wouldn't put a female in the WL position because of the prior problems with Ervin and that this statement is proof of discrimination. (Garza Dep. at 50–51.) Therefore, according to Garza, this Court should ignore the bargaining agreement. Such is not the law, however. Unless the CBA is invalid or was wrongly interpreted, it controls. Because Garza has failed to meet her burden of proof, summary judgment is proper as to her failure to promote claim.

### Harassment/Hostile Environment

■ Garza alleges she endured harassment based on sex, race and national origin and that the harassment created a hostile environment. Title VII states that it shall be "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin." The Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1). "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Johnson v. City of Fort Wayne,* 91 F.3d 922, 938 (7th Cir.1996). However, the anti-discrimination statutes are not a "general civility code." *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). For sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of the victims employment and create an abusive working environment. *Harris v. Forklift*

*Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

### Sexually Hostile Work Environment Harassment

■ A plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment. *Meritor,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49. To establish a hostile-environment sexual-harassment claim Garza must show: (1) that she belongs to a protected group; (2) that she has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that harassment was based on her sex; (4) that harassment was sufficiently severe or pervasive to alter terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding employer liable. 42 U.S.C. § 2000e–2(a)(1). In determining the existence of a hostile environment, courts look to a number of circumstances including: the frequency of the harassment, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance. *Harris,* 510 U.S. at 23, 114 S.Ct. 367. Furthermore, the harassing incidents must be "more than episodic," they must be sufficiently continuous and concerted in order to be deemed pervasive. *Faragher v. City of Boca Raton,* 524 U.S. 775, 786 n. 1, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). The key inquiry in these cases is whether the alleged acts of harassment occurred "but for" the employee's sex.

The courts deciding summary judgment motions have reached a broad range of conclusions regarding what actions actually constitute a hostile environment.[9] The

---

9. *See e.g., Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 264–67 (5th Cir.1999) (noting it was "dubious" whether several sexually oriented comments and gestures and an implied threat of retaliation for refusing a sexual ad-

vance would be sufficient to establish a hostile environment); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768 (2d Cir.1998) (holding that statement that plaintiff had the "sleekest ass" in office plus single incident of

Seventh Circuit is no exception. For example, see *Weiss v. Coca–Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir.1993) (holding plaintiff's claims—supervisor repeatedly asked about her personal life, told her how beautiful she was, asked her on dates, called her a dumb blonde, put his hand on her shoulder at least six times, placed "I love you" signs in her work area, and tried to kiss her once at a bar and twice at work—were not sufficient for actionable sexual harassment); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995) (holding insufficiently severe or pervasive to support a hostile-environment claim nine instances of offensive behavior over seven months including repeated references to plaintiff as a "tilly" and a "pretty girl" and one instance of simulated masturbation); *Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1167–68 (7th Cir.1996) (holding offensive comments including repeatedly calling the plaintiff a "sick bitch" insufficient under *Harris* because not necessarily gender-related), *reh'g denied; Adusumilli v. City of Chicago*, 164 F.3d 353, 357 (7th Cir.1998) (holding actions insufficient to support hostile environment claim where co-employees teased plaintiff, made sexual jokes aimed at her, asked her what "putting one rubber band on top and another on the bottom means," commented about her low neck tops, repeated staring at her breasts with attempts to make eye contact, and four incidents of touching her arm, fingers or buttocks), *cert. denied* ——— U.S. ———, 120 S.Ct. 450, 145 L.Ed.2d 367 (1999). *Compare Timm v. Progressive Steel Treating, Inc.*, 137 F.3d 1008 (7th Cir.1998) (finding evidence that coemployee frequently snuck up from behind employee and grabbed or pinched her buttocks, and less frequently would run his hand up her thighs, and that sexual comments and propositions from him were everyday fare despite her protests was sufficient); *Smith v. Sheahan*, 189 F.3d 529 (7th Cir.1999) (that male employee called plaintiff a bitch, threatened to "fuck [her] up," pinned her against a wall, and twisted her wrist severely enough to damage her ligaments, draw blood, and eventually require surgical correction was sufficient), *reh'g denied.* While there is no bright line which distinguishes actionable behavior from that which is not, the Seventh Circuit has made clear that "Title VII was not designed to purge the workplace of vulgarity, for a certain amount of vulgar banter tinged with sexual innuendo is inevitable in the modern workplace ..." *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1144 (1997).

"deliberately" touching plaintiff's "breasts with some papers that he was holding in his hand" were insufficient to alter the terms or conditions of the plaintiff's employment); *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1365–66 (10th Cir.1997) (holding five "sexually-oriented, offensive" statements over sixteen months insufficient to show hostile environment, even though one of the harasser's statements occurred while he put his arm around plaintiff, looked down her dress and said, "well, you got to get it when you can"). *But see, Williams v. General Motors*, 187 F.3d 553, 558–59 (6th Cir.1999) (finding it sufficient where supervisor looked at plaintiff's breasts and said "You can rub up against me anytime"; said "You would kill me, [plaintiff's name]," "I don't know if I can handle it, but I'd die with a smile on my face"; as plaintiff bent over, "Back up; just back up," or "You can back right up to me"; while placing his arm around her neck and his face against hers, said "You left the dick out of the hand"; co-worker used the "F-word," "Hey slut," "I'm sick and tired of these fucking women"; and plaintiff encountered "pranks" including finding office supplies glued to her desk, being hit by a thrown box, and being locked in her work area), *reh'g denied; Rorie v. UPS, Inc.*, 151 F.3d 757, 761–62 (8th Cir.1998) (facts considered on the borderline of actionable harassment where manager often told plaintiff she smelled good, patted her on the back, and brushed up against her, and behavior continued throughout her employment; constantly 'coming on' to her and was "always flirty" and telephoned her home), *reh'g denied; Howard v. Burns Bros., Inc.*, 149 F.3d 835, 838–39 (8th Cir. 1998) (sufficient where co-employee was always saying plaintiff had nice legs and that he was 'going to get her; he often brushed against her intentionally while the two of them were working in a narrow area; once brushed her buttocks; said and did inappropriate things to other female employees).

In Garza's case there is no question she subjectively believed her environment was hostile. The important question, however, is whether the alleged acts of harassment occurred "but for" Garza's sex. Garza's deposition is full of "I don't remember," "I can't remember," "it just wasn't right," "I complained to everyone," and so on, with little specific factual information. The alleged sexual harassment consisted mainly of "bad language" but she did not label it as sexual in nature.[10] (Garza Dep. at 66; Frush Dep. at 33–34; Moore Dep. at 38–39; Hill Dep. at 49.) Garza admits that she swore and that most of the employees in the unit used "cuss" words (Id. at 166). Furthermore, Garza does not elaborate on specific comments with the exception of one comment Hicks made regarding how women could "bitch and complain about your pussy hurting" and get off the job. (Garza Dep. at 70.) She admits that Hicks never touched her, never asked for sexual favors and never tried to date her. (Id. at 66.) He never made sexual comments like "nice T and A" or referred to her sexually. (Id. at 179.) Additionally, she acknowledges that Hicks used cuss words when he talked to everyone regardless of gender, (Id. at 76), and that Hicks picked on everyone he worked with. (Id. at 79.) This suggests that Hicks's behavior was not directed at Garza and was not "but for" her sex.[11]

In further support of her hostile environment claim, Garza complains about one incident when her female supervisor did not give her a timely bathroom break. Garza was having her menstrual cycle and she bled through her overalls. (Moore Dep. at 54–55.) Additionally, Garza allegedly heard a female co-employee refer to her as a bitch and a slut when talking to another employee. (Garza Dep. at 122.) The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment "to which members of the other sex are not exposed." *Holman v. State of Indiana & INDOT*, 211 F.3d 399, 406 (7th Cir.2000) (quoting *Oncale*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201). Because Title VII is premised on eliminating discrimination, inappropriate conduct that is inflicted on both sexes, or is inflicted regardless of sex, is outside the statute's ambit. *Id.* The actions of Garza's female co-workers were not "but for" her sex. The actions of Hicks were directed at everyone regardless of sex. Furthermore, none of the complained of actions, whether individually or collectively, are harassment of a sexual nature that is so severe as to alter the terms of Garza's employment.[12] Title VII does not forbid sexual harassment as such. *Pryor v. Seyfarth, Shaw, Fairweather & Geraldson*, 212 F.3d 976 (7th Cir. 2000). The harassment must be

10. The majority of the complaints concerned a co-employee, Tony Hicks. Apparently Hicks and Garza began on friendly terms but some incident occurred when the crew went out drinking one night and the two have been at each other ever since. (See Moore Dep. at 45; Robert DeVore Dep. at 25; Tina DeVore Dep. at 12.) Garza also had conflicts with at least two female co-workers and includes their behavior as evidence of her harassment.

11. Garza attempts to use an internal investigation conducted by the Department of Transportation Human Resources office to bolster her claim. Human Resources said sexual harassment existed in the workplace and made the supervisors throw out old Playboy magazines and some pin-ups that were in an employee's locker. (Garza Dep. at 101; Moore Dep. at 56–61.) However, Garza her-self brought in a risque magazine and showed it to co workers telling them what she would do to please a man. (T. DeVore Dep. at 60.) Also, Garza admits she never complained about the "pornography." (Garza Dep. at 104.) It is difficult to claim sexual harassment when one does not complain. Also, if anything, the internal investigation shows that INDOT took adequate steps to solve the problem once it was discovered.

12. The record indicates that Garza continued to perform the same job, receive satisfactory evaluations and maintain the same salary. (Garza Dep. at 159.) Garza claims she suffered stress in her personal life, but admits she did not see a doctor. (Id. at 154–55.) This is not a "change in the condition of employment."

sufficiently severe that a rational trier of fact could find that it had actually changed the conditions of the plaintiff's workplace, *e.g.*, *Silk v. City of Chicago*, 194 F.3d 788, 804 (7th Cir.1999); *Cowan v. Prudential Ins. Co.*, 141 F.3d 751, 755–56 (7th Cir. 1998); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245–46 (11th Cir.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 1674, 146 L.Ed.2d 483 (2000), for only sexual discrimination that changes those conditions is (so far as bears on sexual harassment at any rate) actionable under that statute. *E.g.*, *Smith*, 189 F.3d 529, 532. Nothing in the record indicates a discriminatorily abusive environment. The harassment alleged here falls short of the harassment held in *Baskerville*, 50 F.3d 428, and other cases, *e.g.*, *McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473, 476–77, 480 (7th Cir.1996); *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 538, 534 (7th Cir.1993); *Weiss*, 990 F.2d 333, 334–35, 337; *Mendoza v. Borden, Inc.*, *supra*, 195 F.3d at 1242–43, 1247 (and cases cited in *id.* at 1246–47); *Shepherd v. Comptroller of Public Accounts*, 168 F.3d 871, 872, 874 (5th Cir.1999); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir.1998), to be beyond the reach of Title VII. The Seventh Circuit describes the distinction as follows:

> On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers.

13. *Compare Derrico v. Pinkerton's, Inc.*, NO. 97 C 5851, 1999 WL 311757 (N.D.Ill. May 12, 1999) (where the court noted that "plaintiff is not exactly a blushing violet. . She admits that while on the job she repeatedly used vulgar, profane language, told dirty jokes, graphically discussed her sex life and engaged in sexual

*Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995) (citations omitted). The behavior complained of in this case is clearly that of coarse and boorish workers with vulgar banter from both sexes.[13]

### Racially Hostile Work–Environment Harassment

Garza also claims she was subjected to a hostile environment based on her race and national origin (Hispanic). Generally, whether a hostile environment exists depends on whether the "quantity, frequency, and severity of the racial or ethnic slurs create a work environment so hostile as to discriminate against the minority employee." *Vore v. Indiana Bell Tel. Co.*, 32 F.3d 1161, 1164 (7th Cir.1994). In other words, the harassment "must be sufficiently severe or pervasive so as to alter the conditions of the victim's employment and to create an abusive working atmosphere." *McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 479–80 (7th Cir.1996) (citing *Meritor*, 477 U.S. at 67, 106 S.Ct. 2399). Similar to the sexual harassment analysis, the racial harassment test involves both a subjective and objective component. *See Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1271–72 (7th Cir.1991). The objective standard focuses on the environment's effect on a reasonable person; the subjective standard focuses on the environment's actual effect on the particular employee. *See id.* at 1272.

 In reviewing the reasonableness of a harassment or hostile environment claim, courts consider: the nature of the alleged harassment, the background and experience of the plaintiff, her coworkers, and supervisors, the totality of the physical environment of the plaintiff's work area, the lexicon of obscenity that pervaded the environment of the workplace both before

banter. It would be difficult if not impossible to believe that this plaintiff would be offended by the conduct" and concluded that no reasonable jury could find that the conduct about which plaintiff complained was subjectively hostile.)

and after the plaintiff's introduction into its environs, coupled with the reasonable expectation of the plaintiff upon voluntarily entering that environment. *Daniels*, 937 F.2d at 1274 (quoting *Brooms v. Regal Tube Co.*, 881 F.2d 412, 419 (7th Cir.1989)). In the Seventh Circuit, a plaintiff in order to establish that she was subjected to a racially hostile environment, must show that subjectively she was intimidated and objectively that nobody should be subject to that type of harassment in the workplace. *Rodgers v. Western–Southern Life Insur. Co.*, 12 F.3d 668, 674 (7th Cir. 1993).[14]

■ As evidence of a racially hostile environment Garza alleges that Hicks would "make rude comments about Mexicans" to the point where she "could no longer deal with the small comments" after working with him over a number of years. (Garza Dep. at 72.) She cannot recall when he started making the comments, but it was probably in the first year he worked with Garza.[15] (Id. at 75.) On one occasion, Garza allegedly overheard Hicks say that "Mexican's ... come into this country to f___ing take the jobs away from Americans." (Id. at 164) She heard another employee say "there's a wet back" but doesn't know if the comment referred to her. (Id. at 83.) Garza claims a third employee made remarks about Mexicans to others although she never actually heard any of the comments.[16] (Id.) There is no question that Garza felt these comments were subjectively harassing. However, she provides no evidence that these comments were severe and pervasive or altered the conditions of her employment.[17] While certain employees admit they "joke a lot" and sometimes statements are made about other races, (R. DeVore Dep. at 12, 17–18), the comments were not directly aimed at Garza or only at the Mexican nationality. The evidence in this case indicates that employees also told blond jokes and Polish jokes in the shop. (Id. at 164.) Relatively isolated incidents of trivial mis-

14. In footnote 3 of *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 444 (7th Cir.1994), *vacated and remanded in light of Oncale,* the court listed examples of how courts characterized the racially hostile environment standard. The courts in these cases (which are still good law) focused on repeated racial remarks, and not wrongs merely perceived to be racially motivated: *Vore*, 32 F.3d 1161, 1163 (reaffirming doctrine that in "typical cases, the question is whether the quantity, frequency, and severity of the ... slurs create a hostile work environment"); *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1456 (7th Cir.1994) (finding that consistent pattern of comments sustains hostile environment claim); *Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130, 1132 (7th Cir.1994) (holding that frequent use of racial epithets was intolerable and enough to create a hostile environment); *Rodgers*, 12 F.3d 668, 675 (holding that cumulative weight of several "isolated" racial comments must be considered by the court); *Daniels*, 937 F.2d 1264, 1270–75 (7th Cir.1991) (concluding that pervasive pattern of racial slurs, graffiti and jokes were sufficient to sustain a hostile environment claim).

15. The Court notes that some of the alleged comments may well be time barred, but does not address that issue because Garza claim fails on other grounds.

16. Garza also alleges that some of the male workers were offended by Hicks's behavior, (Dep. at 72), that she heard comments made about other women (Id. at 1779), and that Hicks harassed a male employee (Id. at 176.) None of these allegations is related to Garza's claim. Compare *Pryor v. Seyfarth, Shaw, Fairweather & Geraldson*, 212 F.3d 976 (7th Cir.2000) (Plaintiff argued that she was told defendant leered at her without her knowing it. Court found this irrelevant).

17. In an attempt to support her argument that conditions of her employment were altered and that she feared Hicks, Garza alleges an incident where she was with a co-worker and claims Hicks had a gun (Dep. at 180) and commented to her that he could "go postal." (Id. at 181.) However, Hicks was in his truck at the time and was not directly confronting Garza. He never pointed the gun at her, he pointed it at himself. (Id.) Furthermore, co-workers' testimony does not support her claim. (Tackett Dep. at 19–20, 35–36; Hill Dep. at 56–7; Hicks Dep. at 10–11, 15.) Also, after the internal investigation all employees were notified not to carry their hunting weapons with them if their vehicles were on INDOT property.

conduct do not support a hostile environment claim. *See Saxton,* 10 F.3d 526, 533. None of the comments cited by Garza, whether standing alone or considered in their totality rise to the level of severity so as to create an objectively hostile or abusive work environment as envisioned under Title VII. *See Harris,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295; *Faragher,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662. *See also, Hedberg v. Rockford Stop–N–Go, Inc.,* 202 F.3d 273, 1999 WL 1100303 (7th Cir. Dec.1, 1999) (summary judgment granted where coworker called female a fat white bitch and spit at her); *Vollmert v. Wisconsin Dept. of Transp.,* 197 F.3d 293 (7th Cir.1999) (comments made criticizing plaintiff's disability not sufficiently pervasive); *Silk,* 194 F.3d at 798 (7th Cir.1999) (name calling in public place, and one occasion when supervisor allegedly hinted that officer might find bomb under his car not sufficient); *Filipovic v. K & R Exp. Sys., Inc.,* 176 F.3d 390 (7th Cir.1999) (four national origin-related comments made over course of more than a year not sufficient).

### Employer Liability

■ Even if the behavior and comments cited by Garza were sufficient for the purposes of Title VII, she still must show that there is a basis for holding INDOT liable. In two cases decided the same day, *Faragher* and *Ellerth,* the Supreme Court clarified and elaborated on its previous decisions regarding when an employer can be held liable for hostile work environment sexual harassment. *See Faragher,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662; *Burlington Industries, Inc., v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). A plaintiff attempting to prove discrimination based upon a racially or ethnically hostile environment must establish not only the existence of harassment so severe and pervasive that it

alters the terms and conditions of plaintiff's employment, from both a subjective and objective view, but also that plaintiff's employer acted negligently with respect to the harassment; that is, knew or should have known that it was taking place, and failed to take reasonable remedial action. *See Shepherd v. Slater Steels Corp.,* 168 F.3d 998 (7th Cir.1999); *Jansen v. Packaging Corp. of America,* 123 F.3d 490, 546 (7th Cir.1997), *cert. granted sub nom., Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633.

■ There is no dispute that the employee handbook set forth a definite policy against sexual harassment. This plaintiff signed for that book on November 29, 1994, and there were definite procedures to follow. Furthermore, a revised handbook was signed for by Garza on January 26, 1996. It, too, set forth procedures to follow if harassment was suspected.[18] Moreover, Garza was the chief steward in 1996 with responsibility for the North Manchester Unit of Unity Team's Local 9212. She was familiar with Union grievance procedures. The record indicates that Garza complained frequently about language or about co-employees not getting along, however, she never told her supervisors she was being racially or sexually harassed. (*See* Frush Dep. at 33–36) (No racial or ethnic complaints made to him, just bad language. He would have behaved differently if he had thought there was a racial problem.) (*See* Moore Dep. at 41.) (doesn't recall her ever complaining about the alleged comment regarding "Mexicans taking jobs away from Americans.") In face, Garza admits that she did not specify sex or race harassment when complaining to Moore, because she "thought Ed knew" (Garza Dep. at 190.) (*See also,* Hill Dep. at 49, 54.) (does not recall Garza complaining about anything other than cuss words.) Furthermore, she did not notify internal affairs and never

---

**18.** Garza does not dispute that all of the other employees possibly involved in this transac-

tion received and signed for the handbook.

filed a grievance with the union. With respect to the extent of the notice given to an employer, a plaintiff cannot withstand summary judgment without presenting evidence that she gave the employer enough information to make a reasonable employer think there was some probability that she was being [sexually] harassed. *Zimmerman v. Cook Co. Sheriff's Dep't*, 96 F.3d 1017 (7th Cir.1996), *reh'g denied; Savino v. C.P. Hall Co.*, 199 F.3d 925 (7th Cir.1999). Based on Seventh Circuit precedent, in a case such as this the employer's duty to investigate and if appropriate take remedial measures is not activated until the employee complains of [sexual] harassment. *See e.g., Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1035 (7th Cir. 1998); *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010 (7th Cir. 1997). In this case, INDOT had notice only of "cussing" and personality conflicts. There is no evidence INDOT knew or should have known that Garza considered the behavior sexually and racially harassing.

 Additionally, even if this Court determined Garza had adequately notified INDOT of the harassment, INDOT took reasonable steps to eliminate the complained of behavior. An employer's legal duty in co-employee harassment cases will be discharged if it takes "reasonable steps to discover and rectify acts of [harassment] of its employees." *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir.1998) (quoting *Baskerville*, 50 F.3d 428, 432). When Garza complained about the language, management tried to resolve the situation. (Auer Dep. at 30–33.) Employees were "talked to." (Id.; Frush Dep. at 36–37; Moore Dep. at 40–41.) The management tried to structure the daily work assignments so that Garza did not have to work with Hicks. (Moore Dep. at 50.) Finally, management transferred Hicks to a different work group. (Auer Dep. at 31.) When Garza complained about the incident where she was not allowed a bathroom break her supervisor investigated and issued verbal reprimands. (Auer Dep. at 26–7.) Moreover, in spite of the fact that Garza did not follow the handbook and did not file a complaint, INDOT conducted an internal investigation, made employees throw out certain objectionable magazines and, reprimanded and temporarily suspended several employees. Additionally, all employees were required to attend sexual harassment training. It is clear that as soon as INDOT became aware of a problem, even though it might not have been labeled as sexual or racial harassment, INDOT took action to correct the situation.

In the area of a hostile work place, Garza has fallen far short of meeting the basic pleading standards of *Meritor*, 477 U.S. 57, 106 S.Ct. 2399, and *Harris*, 510 U.S. 17, 114 S.Ct. 367. Looking at the alleged conduct referred to by this plaintiff, the same is far less egregious than that in *Scott v. Sears Roebuck & Co.*, 798 F.2d 210 (7th Cir.1986). This court has no difficulty at all in granting summary judgment with regard to that issue. This is especially true given the language reasoning and result of *Minor v. Ivy Tech State College*, 174 F.3d 855, 858 (7th Cir.1999). *See also, Baskerville*, 50 F.3d 428, 431.

### *Retaliation/Constructive Discharge*

 Claims of retaliation and constructive discharge are extremely hard claims to make in this context and in the context of the relevant case law in this circuit. There is a very serious question as to whether or not there is enough evidence to make a jury case in either. Employers are prohibited by Section 2000e–3(a) from retaliating against any employee or applicant because she has opposed any discrimination prohibited by Title VII or because she has made a charge, testified, assisted or participated in an investigation, proceeding or hearing under Title VII. A Title VII plaintiff must show three things to establish prima facie case of retaliation: she engaged in statutorily protected activity; she suffered an adverse action; and

there is a causal link between the protected activity and the adverse action. *Essex,* 111 F.3d 1304, 1309. Retaliation, like other discriminatory action, may be established in either of two ways: by direct evidence or by the indirect burden-shifting method of *McDonnell Douglas. See, e.g., Sanchez v. Henderson,* 188 F.3d 740, 745–46 (7th Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 1201, 145 L.Ed.2d 1104 (2000); *Knox v. Indiana,* 93 F.3d 1327, 1333–34 (7th Cir.1996); *Helland v. South Bend Community Sch. Corp.,* 93 F.3d 327, 329 (7th Cir.1996), *cert. denied,* 519 U.S. 1092, 117 S.Ct. 769, 136 L.Ed.2d 715 (1997). Under either method, summary judgment is improper if the plaintiff offers evidence from which an inference of retaliation may be drawn.

■ First the Court questions what protected activity Garza engaged in. While she complained to her supervisors about cussing and people not getting along, Garza admits she did not file a complaint with internal affairs or her union and she vehemently denies that she had anything to do with the Human Resources internal investigation. Construing the facts in favor of Garza, if complaining to her supervisors was the protected activity, Garza must still show that some adverse action occurred as a result. She says she received unfavorable assignments after the investigation, yet in her deposition she states, "mine didn't so much change because I did pretty much what they asked me to do." (Dep. at 110.) She simply states that "they seemed to be different." (Dep. at 115.) However, she then admits that after the investigation she was not assigned any job that she had never done before (id.), her benefits did not change (id.), and her evaluations did not change. (Id. at 159.) Essentially, her retaliation claim is based on the fact that she "felt like she was shunned." (Id. at 116.) Garza also claims she was subjected to excessive drug testing after the Human Resources investigation. She states she was tested a total of three or four times during her employment with INDOT. (Dep. at 137.) A co-employee testified that he was tested about four or five times. (Hicks Dep. at 16.) Garza contends that because she was tested "within a few days or a few weeks" of the Human Resources investigation, that this is evidence of retaliation. (Id. at 146.) Certainly, federally mandated random drug testing is *not* an adverse employment action, and it is especially so in INDOT giving its basic governmental functions and the safety values that are involved. Based on the record in this case there simply is no evidence that Garza was subjected to any adverse employment action. Accordingly, she has failed to make her claim of retaliation.

### *Constructive Discharge*

■ Courts have interpreted Title VII so as to allow an employee who resigns to have a cause of action against the employer if the employee was constructively discharged due to illegal sexual discrimination. To prevail on her constructive discharge claim, Garza must establish that: (1) the conditions at INDOT were so intolerable that a reasonable person would have been compelled to resign; and (2) the working conditions were intolerable in a discriminatory way. *Yoho v. Tecumseh Prod. Co.,* 43 F.Supp.2d 1021 (E.D.Wis. 1999); *Bragg v. Navistar Int'l Transp. Corp.,* 164 F.3d 373, 377 (7th Cir.1998); 21 Federal Procedure, LEd, Job Discrimination § 50:1. Furthermore, even though an employee who quit or resigned his or her position may prove a Title VII violation on the part of the employer, it does not necessarily follow that the court will also find that the employee was constructively discharged. Courts generally have required a demonstration of "aggravating factors" that would justify the employee's resignation. *E.E.O.C. v. Hay Assoc.,* 545 F.Supp. 1064 (E.D.Pa.1982). The Court must analyze these circumstances from the perspective of a reasonable person in the plaintiff's position. *Oncale,* 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201. Simple teasing, off-hand comments, and isolated incidents (un-

less extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. *Id.* The bottom line is that a plaintiff must present evidence that she had no other option than to quit. *Id.* (citing *Yearous v. Niobrara County Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th Cir.1997), *cert. denied,* 523 U.S. 1074, 118 S.Ct. 1515, 140 L.Ed.2d 669 (1998)). Additionally, an employee who quits without giving her employer a reasonable chance to work out a problem is not constructively discharged. *See Shealy v. Winston,* 929 F.2d 1009, 1013 (4th Cir. 1991); *Garner v. Wal–Mart Stores, Inc.,* 807 F.2d 1536, 1539 (11th Cir.1987); *Raley v. Board of St. Mary's County . Comm'rs,* 752 F.Supp. 1272, 1279 (D.Md.1990).

This plaintiff resigned her employment voluntarily and must climb a very deep hill to make a constructive discharge case. *See Saxton,* 10 F.3d 526, 536. *See also Chambers v. American Trans Air Inc.,* 17 F.3d 998, 1005 (7th Cir.1994), *reh'g en banc denied, cert. denied,* 513 U.S. 1001, 115 S.Ct. 512, 130 L.Ed.2d 419. Working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because "in the 'ordinary' case, an employee is expected to remain employed while seeking redress." *Tutman v. WBBM–TV, Inc./CBS, Inc.,* 209 F.3d 1044 (7th Cir. 2000). *See Drake v. Minnesota Mining & Mfg. Co.,* 134 F.3d 878, 886 (7th Cir.1998).

In cases finding constructive discharge, the plaintiffs suffered from much more severe and sustained harassment. *See, e.g., Snider v. Consolidation Coal Co.,* 973 F.2d 555, 558 (7th Cir.1992), *cert. denied; Taylor v. Western & S. Life Ins. Co.,* 966 F.2d 1188, 1191 (7th Cir.1992); *Sanchez v. Denver Pub. Sch.,* 164 F.3d 527, 534 (10th

Cir.1998).[19] In *Taylor,* the court found constructive discharge when the plaintiffs' boss constantly peppered the plaintiffs with racist comments, brandished a pistol and held it to one plaintiff's head. *Taylor,* 966 F.2d at 1191. Similarly, in *Brooms v. Regal Tube Co.,* 881 F.2d 412, 417, 423 (7th Cir.1989), the plaintiff established constructive discharge where "repeated instances of grossly offensive conduct and commentary" culminated with an incident during which a co-worker showed the plaintiff a racist pornographic photograph, told her that she was hired to perform the task depicted in the photograph, grabbed the plaintiff and threatened to kill her.

■ The incident that lead to Garza's voluntary quit involved a dispute between her and a female co-worker. The co-worker allegedly told another employee that Garza was lazy and she blamed Garza for causing hard feelings among the workers. Garza overheard the comments and became angry. She complained to her supervisor. The supervisor investigated the incident and made a written report about the co-employee's behavior. While the supervisor was checking in to things, Garza told her WL that he needed to go to the supervisor and back her up. She allegedly told the WL that the supervisor wanted to talk to him, when, in fact, the supervisor made no such request. The supervisor then called Garza to his office and wrote a report about her behavior. Garza blew up, swore at her supervisor and said since everyone was against her, she quit. Even if this incident is coupled with Garza's claims of retaliation, the conduct complained of simply is not sufficiently severe to make a constructive discharge claim under prevailing law in this circuit. *See Vitug v. Multistate Tax Comm'n,* 860

**19.** *See generally, Rabinovitz v. Pena,* 89 F.3d 482, 489 (7th Cir.1996) (holding a situation not so intolerable to force the plaintiff to resign where the plaintiff was subjected to constant mean, humiliating insults; to unfair workplace restrictions; and who was also denied $600 bonus and her request to start work at six o'clock A.M.); *Perry v. Harris Chernin,*

*Inc.,* 126 F.3d 1010, 1015 (7th Cir.1997) (Finding that a reasonable person in the plaintiff's position would not have felt compelled to resign because quitting was not the only option available to the plaintiff; her employer offered her work at another store away from the harassing store manager).

F.Supp. 546 (N.D.Ill.1994), *aff'd*, 88 F.3d 506 (7th Cir.1996). Accordingly, summary judgment is proper as to this claim.

### CONCLUSION

For all of the reasons explained *supra*, the Defendant's Motion for Summary Judgment is **GRANTED** and the Clerk should enter judgment for INDOT and against Garza accordingly. Each party will bear its own costs.

**IT IS SO ORDERED.**